FILED & JUDGMENT ENTERED
David E. Weich

Jun 26 2009

Clerk, U.S. Bankruptcy Court
Western District of North Carolina

_____
J. Craig Whitley
United States Bankruptcy Judge

## UNITED STATES BANKRUPTCY COURT
### FOR THE WESTERN DISTRICT OF NORTH CAROLINA
### Wilkesboro Division

| | | |
|---|---|---|
| In re: | ) | |
| | ) | Case No. 05-51264 |
| CARROL WALL WALKER, | ) | Chapter 7 |
| | ) | |
| Debtor. | ) | |
| _____ | ) | |
| | ) | |
| SHDHIR HASALIA and | ) | Adversary Proceeding |
| PHETH K. THADAVONG, | ) | No. 05-5023 |
| | ) | |
| Plaintiffs, | ) | |
| v. | ) | |
| | ) | |
| CARROL WALL WALKER, | ) | |
| F/D/B/A CARROL WALKER | ) | |
| & COMPANY, | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

### MEMORANDUM OPINION

**THIS MATTER** was before this Court on July 14, 2008 and again on August 7, 2008, upon the following matters:

(1) Motion of the Chapter 7 Debtor/Defendant Carrol Wall Walker ("Walker") seeking to dismiss the action pursuant to Federal Rules of Civil Procedure 12(b)(6);

(2) Walker's Motion for Summary Judgment;

1

(3) Plaintiffs' Sudhir Hasalia and Pheth K. Thadavong (collectively "Purchasers") Motion to Amend their Complaint; and

(4) The trial of this dischargeability action.

**PROCEDURAL POSTURE**

The Honorable Marvin R. Wooten, Recalled U.S. Bankruptcy Judge, heard the aforementioned motions in Wilkesboro, North Carolina on July 14, 2008. At that time, Judge Wooten issued bench rulings: (1) denying Walker's Motion to Dismiss; (2) denying Walker's Motion for Summary Judgment; and (3) allowing Purchasers' Motion to Amend their complaint to state a third legal grounds for nondischargeability, under 11 U.S.C. §523(a)(6).

The case proceeded immediately into the trial phase. Purchasers presented evidence in support of their claims, including calling Walker to the stand. Their evidentiary presentation could not be completed, so the trial was continued until August 7, 2008. On that date, and at the end of Purchasers' evidence, Walker moved for a directed verdict. Her motion was denied. Walker did not offer further evidence in defense of the matter. After hearing final arguments, Judge Wooten announced a trial verdict in favor of the Purchasers. His bench ruling declared the Purchasers' debt (reflected by a prior

state judgment described below) to be nondischargeable in Walker's bankruptcy case.

Before a written decision could be prepared, Judge Wooten became ill. He died with the written decision still outstanding. Thereafter, the attorneys brought this situation to my attention. I agreed to review the proceeding record; to listen to the electronic recordings from the hearings and trial; and to review the exhibits. I would either enter findings, conclusions and rulings on these matters as contemplated by Federal Rules of Bankruptcy Procedure 9028 and Federal Rules of Civil Procedure 63, or a new trial would be set.

With that review now completed, I conclude that a decision can be entered without the necessity of a new trial or of recalling witnesses. Doing so will not prejudice the parties, for several reasons. First, as to each motion and then for the trial verdict, Judge Wooten announced his ruling from the bench and either described his reasoning or it was apparent. Second, much of the relevant evidence is either undisputed and/or documentary, so there is little need to observe the witnesses. Finally, I agree with Judge Wooten's findings and his legal conclusions. These are adopted and restated herein, with only minor revisions and amplification.

**STATEMENT OF THE CASE**

This dischargeability action follows litigation between the same parties in Mecklenburg County, North Carolina Superior Court (the "state court action.")  Each action pertains to earnest money deposits (collectively the "Deposit") posted by the Purchasers with Walker, a real estate broker, in conjunction with their attempts to buy a convenience store business.  After many months and after several prospective purchases failed to close, Purchasers sought return of the Deposit from Walker.

Walker failed to return these monies, causing Purchasers to sue her in state court alleging breach of contract, fraud conversion, etc. The state action was tried before a jury on June 6, 2005.  The jury returned a verdict for Purchasers in the amount of $60,000.00 plus costs (the "Judgment debt") based upon a theory of breach of contract.  Walker failed to pay the Judgment debt and instead filed this Chapter 7 case. She seeks to discharge the Judgment debt in this bankruptcy case. Purchasers object.

**FINDINGS OF FACT**

    A.   <u>Facts Leading Up to the State Court Action</u>

    1.   Walker filed a Chapter 7 bankruptcy petition on July 14, 2005.

2.   In the late 1990's, Walker was a North Carolina licensed real estate broker who specialized in the sale of convenience stores.

3.   The Purchasers were coworkers.   Facing possible layoffs, Purchasers decided to partner in a convenience store business. Looking for a store to purchase, Purchasers saw one of Walker's sale listings in a Charlotte newspaper. They called Walker to inquire about the property, a convenience store located in Catawba County, off I-40 (the "Bunker Hill Exxon").

<u>Bunker Hill Store</u>

4.   After meeting with Walker and her client, Royal Interprises, Inc., on January 7, 1999, Purchasers entered into a contract with sellers to purchase the Bunker Hill Exxon business for $235,000.   Under the contract, Walker was acting exclusively as the seller's broker.

5.   As a condition of the contract, and prior to receiving financial information on the Bunker Hill Exxon, each of the Purchasers was required to post a $15,000 Deposit. The contract stipulated that the Deposit be held in escrow by Walker and either (a) applied to the purchase price at closing or (b) otherwise disbursed as agreed to by the parties.

6.   The Bunker Hill Exxon purchase was subject to two significant conditions: a) Purchasers ability to obtain bank financing and (b) their receiving a satisfactory lease of the

real property on which the Bunker Hill Exxon was sited.  Should Purchasers be unsuccessful in either endeavor, the contract provided that their Deposit would be returned to the Purchasers. In the event of a dispute, Walker was obliged to hold the funds pending agreement by the parties or a court order as to their disposition.

7.    Hasalia and Walker met with the landlord seeking to obtain a lease. The landlord declined to sign a lease with the Purchasers.  Lacking a lease, the Purchasers' prospective lender was unwilling to extend financing. Thus, with neither contract contingency met, the Bunker Hill Exxon sale failed to close by the March 30, 1999 closing date.

8.    When the Bunker Hill Exxon purchase fell through, Walker offered to show the Purchasers some of her other business listings.  At her suggestion, Purchasers agreed that Walker continue to hold their Deposit while another suitable store was sought.  However, the Purchasers did not retain Walker as a buyer's broker.

9.    Walker and the Purchasers continued to look for another store. They kept in touch, speaking a couple of times each month about prospective sites.

Golden Leaf Store

10.    In October 1999, Walker called the Purchasers about another of her sellers' listings, a convenience store in

Blacksburg, South Carolina known as the "Golden Leaf" store owned by Jay and Chirag Patel (the "Patels"). The Purchasers looked at the property, found it suitable, and on October 17, 1999, entered into a contract to purchase it. Under this contract, Walker was also acting exclusively as the seller's broker.

11. The Golden Leaf store was a larger store with a larger purchase price, $800,000. Accordingly, a larger Deposit was required of the Purchasers, a total of $35,000. Again, under the contract, Walker agreed to hold the Purchasers' Deposit in escrow, under the same terms as before. Since she was already holding $15,000 of the Purchasers money, each of the Purchasers entrusted Walker with another $10,000.

12. The Golden Leaf contract also contained a significant contingency. This time, Purchasers were permitted "a two-week in-house inspection of the business and finances of the operation." Basically, the Purchasers were allowed an opportunity to observe store operations and to confirm the operating information reported by the Patels. Under the contract, if within the inspection period, the Purchasers "find the business unacceptable," they are entitled to a refund of their Deposit, payable within ten working days.

13. With the contract signed, Purchasers went into the Golden Leaf store for their inspection period. During this two-

week span, the store was staffed and operated by the sellers'
employees. Purchasers did not direct store operations during
this time. Rather, they simply observed operations, meaning they
looked over the shoulders of the Patels' cashiers and the store
manager during business hours. The store remained the sellers'
property during this period as reflected by the fact that the
Purchasers did not even have a key to the premises.

14. Purchasers immediately realized that the actual sales
volume of the Golden Leaf store was much less than reported by
the Patels.  Hasalia first called Walker about this "problem"
and then called the Patels. Both were apprised of the
Purchasers' concerns within the two-week rescission period.

15. Because of these discrepancies, the Purchasers agreed
with the Patels to cancel the purchase.  The Purchasers were to
recover both their Deposit and some $79,000 for inventory which
Purchasers had funded during the inspection period due to the
Patels' inability to purchase the same.   Lacking sufficient
cash to repay Purchasers for that inventory, the Patels signed a
$79,000 Note, which was to be repaid as soon as they sold their
cigarette inventory. However, that promise would not be
realized. The Purchasers were forced to sue the Patel's in South
Carolina state court for these monies.

16. Meanwhile, Walker was still holding $35,000 of the
Purchasers' Deposit. They and Walker disagree as to their

agreement regarding the escrowed funds.  Walker maintains that since she was continuing to show the Purchasers other properties, it was agreed that she should continue to hold their Deposit.

17.  Purchasers disagree.  They maintain that after rescinding the Golden Leaf contract, they asked Walker to return their Deposit.  Walker initially responded by saying she would need the written consent of the Patels in order to release the Deposit.  Thereafter, on each of several occasions in which the Purchasers asked for their money, Walker deflected the request with some excuse.

18.  Based upon the available extrinsic evidence, the Purchasers have the more credible account of these events.  Walker, did in fact, prepare a form for the Patels to sign, which would release the Purchasers' Deposit.  Further, both Patels signed that release: one on February 11, 2000; the other on March 1, 2000.  The fact that such a release was sought and obtained from the Patels strongly suggests that the Purchasers had in fact sought return of their moneys. Apparently the state jury thought so as well, given that it returned a $60,000 verdict in favor of the Purchasers.

19.  Meanwhile, Walker quickly found the Purchasers another convenience store business to consider.

The Fairgrove Church Store

20.   In February of 2000, Walker called the Purchasers about another of her listings, this one located on Fairgrove Church Road, in Hickory, North Carolina. Royal Foods, Inc. ("Royal Foods"), one of Walker's regular seller clients, owned the store.[1]

21.   The Purchasers were also interested in this store. They quickly signed a contract with Royal Foods on March 1, 2000 to purchase the Fairgrove Church store property for $350,000. As with the Golden Leaf deal, this contract also required a $35,000 Deposit from the Purchasers. Unlike the two prior contracts, this agreement denoted Walker as being a "Dual Agent," meaning she was representing both parties. The Fairgrove Church contract contained contingencies and earnest money provisions similar to those seen in the two preceding contracts:

   a.   The closing had to occur by a date certain, here April 15, 2000;

   b.   A pre-closing inspection period was afforded the Purchasers;

   c.   Royal Foods, which did not own the real property, was obliged to provide Purchasers with a satisfactory (to them) lease agreement;

[1] The record is unclear whether Royal Foods, Inc. and Royal Interprises, the seller of the Bunker Hill Exxon are the same party or if they are related parties. Either way, they were both existing clients of Walker's.

d.    There was a financing contingency; and

e.    A profit and loss verification provision was included
      in the agreement.

22.   Again problems arose. Royal was unable to provide the
Purchasers with a long-term lease for the building in which the
business was sited.   The seller would only offer a short-term
lease.     Without a long-term commitment, the SBA, the
Purchasers' prospective lender would not make the loan.   As a
result, the Purchasers were unable to obtain financing before
the April 15, 2000 closing date. For the third time, their
purchase fell through.

23.   In the wake of this last failed purchase, Purchasers
again requested return of their Deposit from Walker. Walker,
however, failed to return their money.   Unbeknownst to the
Purchasers, their money was already gone.

24.   Unknown to the Purchasers, Walker had written herself
a $35,000 commission check out of the Deposit sometime around
the Golden Leaf inspection period.   Even though she knew that
the sale was unraveling (or had unraveled), and even though
Walker was not acting as buyer's broker, she unilaterally
decided she had earned her commission and cut herself a check.

25.   Attempting to justify her appropriation of the
Purchasers' Deposit, Walker testified she believed her
commission to have been "earned" two weeks after the Purchasers

began their observation period at the Golden Leaf store. However, Walker's testimony was belied by the fact that almost immediately after going onsite, the Purchasers had called Walker to inform her that they had concerns about the actual store sales as compared to those that had been represented by the sellers. Walker was also aware that Purchasers' satisfaction with the operations was a contract condition.

25. Seeking to diffuse this implication, Walker testified that she referred the Purchasers and their sale concerns to the Patels, and she was not a part of their discussions thereafter. She believed the Purchasers had stayed beyond the two-week inspection period and, therefore, she considered the contract condition to be met. She paid herself a commission out of the Deposit shortly afterward. Walker's assertion is not credible, with the primary reason being that Walker did not inform anyone, buyer or seller, that she had paid herself the money. Moreover, contractually the earnest monies were to be applied to the sales price; they were not available to pay the seller's broker. As seller's broker, Walker was not entitled to be paid by the Purchasers, especially without their knowledge.

26. Walker also testified that since the Golden Leaf sale did not go through, she intended to "credit" the Purchasers $35,000 Deposit against her commission in a future sale. Just how she intended to make this credit is not clear. To this

point, Walker had been acting exclusively as the sellers' agent. The Purchasers had not committed to pay her a commission;[2] nor had the parties discussed such an arrangement. Obviously, there never was a completed purchase from which to pay a commission. The intention, therefore, appears to be nothing but rationalization by the realtor for misappropriating the monies.

B.    The State Court Action

27.    On April 27, 2004, the Purchasers sued Walker for return of the Deposit in the Superior Court of Mecklenburg County, North Carolina. *See Hasalia vs. Walker*, Civil Action No. 04 CVS 7773 (Mecklenburg County Superior Court Apr. 27, 2004). The complaint variously describes Walker's treatment of the Deposit as a breach of contract (state action Complaint ¶ 16); wrongful retention and conversion (*Id.* at ¶ 14-15); and intentional, willful, malicious, fraudulent, and wanton acts and omissions (*Id.* at ¶ 19). The complaint seeks damages, costs, pre and post judgment interest and punitive damages under North Carolina General Statute §1D-15, §1D-25 and §1D-35. *Id.*

29.    The Buyer's action against Walker was tried before a jury in May 2005. The presiding state judge charged the jury only with deciding the breach of contract claim. Neither party

---

[2] The third contract listed Walker on its face as a co-broker, but contained no commitment by the Purchasers to pay her a commission. She did not have a buyer brokerage agreement with them. In any event, she appropriated the earnest monies before this contract was signed.

knows what happened to the Purchasers' remaining legal theories.[3] They were not decided by any preliminary motion or order entered in the case. The transcript from the charge and the resulting written judgment entered by the state court makes no mention of those missing theories.

31.   Instead, the jury was charged with answering three specific questions:

A.   Did defendant, Carrol Walker d/b/a Carrol Walker & Company, breach a contract with Purchasers?

B.   Did Purchasers waive defendant's breach of the contract?

C.   How much money, if any, does defendant, Carrol Walker d/b/a Carrol Walker & Company, owe Purchasers in this case?

32.   The jury returned a verdict answering, "Yes" to the breach of contract question. They answered, "No" to the waiver question. As to Purchasers' damages, they found these to be "$60,000.00."

33.   On June 6, 2005, a written judgment was docketed awarding the Purchasers the sum of $60,000.00 and their costs.

34.   On July 14, 2005, Walker filed this bankruptcy case. The entire amount of the Judgment debt was outstanding at the time and remains unsatisfied.

---

[3] Different counsel than those appearing in this adversary proceeding tried the state case. One of the original attorneys has since passed away.

**PARTIES' POSITIONS**

The Purchasers maintain that the Judgment debt is nondischargeable under two different subparts of 11 U.S.C. §523(a). First, they argue Walker, as a broker/escrow agent, owed them fiduciary duties under §523(a)(4) which she breached: (A) She refused to return their Deposit after it was known that the contract conditions could not be met by seller; (B) She refused to return their Deposit after demand for its return; and (C) She instead paid herself these monies as a commission without Purchasers knowledge, and thereby embezzled or committed larceny or defalcation as to the Deposit. (Complaint, Count II).[4]

Alternatively, the Purchasers contend that Walker, by her actions, wrongfully converted their Deposits to her own use, a willful and malicious injury within the meaning of §523(a)(6). (Complaint, Count III).

Not withstanding the jury verdict, Walker denies owing a debt to the Purchasers. She maintains that the state action was time barred and should have been dismissed by the presiding state court judge. However, if the Judgment is to be recognized in this proceeding, Walker argues that the breach of contract verdict bars Purchasers from maintaining in the current action that their debt was the product of fraud, defalcation, or a

---

[4] The adversary proceeding Complaint also alleged a 11 U.S.C. §523(a)(2) fraud or misrepresentation count. This theory was argued by the parties in the motions, but was ultimately abandoned by the Purchasers at the end of Plaintiff's evidence. Consequently, it will not be addressed by this opinion.

willful and malicious injury.   Since a simple breach of contract debt would be dischargeable in bankruptcy, Walker believes she should prevail in this action.

**ISSUES PRESENTED**

This action requires that this Court determine four legal issues:

1.   Can this Court reconsider the statute of limitations and liability on the claim issues decided by the state court in the context of this dischargeability proceeding?

2.  Assuming the Judgment to be valid, are the Purchasers estopped by the state jury verdict and its breach of contract finding from maintaining that the debt was the product of defalcation, larceny embezzlement under §523(a)(4) or a willful and malicious injury under §523(a)(6)?

3.   Under §523(a)(4), did Walker as a broker/escrow agent owe Purchasers fiduciary duties, which she breached by applying the Deposit to her broker's commissions without approval?

4.   Under §523(a)(6), did Walker commit a willful and malicious injury to Purchasers by applying the Deposit to her broker's commissions without approval?

I hold that the answer to the first two issues to be "No;" whereas, the answer to the last two questions is "Yes."

**DISCUSSION**

## I.  Jurisdiction

This adversary proceeding was brought under §523(a)(4) and (6) and Federal Rule of Bankruptcy Procedure Rule 7001. Jurisdiction exists in this bankruptcy court under 28 U.S.C. § 1334 and pursuant to reference orders. *See* (Administrative Order Assigning and Allocating All Bankruptcy Matters for Administration and Otherwise Handling and Supervision to Judge Hodges, Judge Whitley and Judge Wooten dated May 31, 1995). This adversary proceeding "arises under" Chapter 7, Title 11, U.S. Code, and constitutes a "core" proceeding. 28 U.S.C. §157.

## II.  Walker's Statute of Limitations and Liability on the Claim Defenses were Litigated and Decided by the State Court, Such That They May Not Be Reconsidered in this Federal Proceeding.

During the state trial, Walker's attorney argued to Judge Adkins that the Purchasers' claims were governed by a three year (catch all) statute of limitations provided for at North Carolina General Statues §1-52(1), (4), (9). (Superior Court Answer, Second Defense).[5] In letting the matter go to the jury, Judge Adkins rejected Walker's argument.

Similarly, while the state jury found in the Purchasers' favor on both liability and damages, Walker argues that their verdict was flawed. *See* Def.'s Mot. for Summ. J. ¶ 10.

---

[5] Walker maintained that Purchasers' state causes of action accrued on April 15, 2000. Their complaint was not filed until April 29, 2004, or four (4) years later.

Although she disagreed with these rulings, Walker did not appeal the state action, and the Judgment became final well before bankruptcy. Nevertheless, Walker seeks a "do over" in federal court, arguing that these state rulings were erroneous. *See id.*

At the July 14th hearing, Judge Wooten rejected both of Walker's arguments, holding that since these matters were tried and decided by the state court, they may not be re litigated in this forum. In short, Judge Wooten's bench ruling was that the *Rooker-Feldman* Doctrine and/or principles of collateral estoppel prevented the re-litigation of these matters in bankruptcy court. I entirely agree.

Under the *Rooker-Feldman* doctrine, state-court losers are not permitted to bring follow-up actions in federal court for the purpose of complaining of errors and injuries caused by state court judgments and inviting federal court review of those judgments. *See Exxon Mobil Corp. v. Saudi Basic Indus. Corp.,* 544 U.S. 280, 292 (2005); *District of Columbia Court of Appeals v. Feldman,* 460 U.S. 462, (1983); *Rooker v. Fidelity Trust Co.,* 263 U.S. 413 (1923).

The *Rooker-Feldman* Doctrine is founded upon the premise that U.S. district courts possess "strictly original"

jurisdiction.[6]  *Exxon Mobil*, 544 U.S. at 284.  Congress empowered only the Supreme Court to exercise appellate authority "to reverse or modify" a state-court judgment.  *Id.* at 285. Consequently, the lower federal courts lack the requisite appellate authority to review a state court's rulings.  *Id.* at 292.

In asking this bankruptcy court to substitute its judgment for that of the state court judge and the jury, Walker is seeking precisely that type of federal appellate review of a state court decision.   In fact, our case presents almost identical circumstances to those found in *Rooker*.   There, the losing parties in the state court action asked a U.S. district court for relief from that decision. *Rooker*, 263 U.S at 414-15. On the allegation that the state court judgment was rendered in contravention of the U.S. Constitution, the parties asked the federal court to declare it "null and void." *Id.*

In upholding the lower court's dismissal of the suit for lack of jurisdiction, the U.S. Supreme Court noted that the state court had acted within its jurisdiction. *Id.* at 415, 417. Accordingly, if the lower court's decision was wrong, "that did not make the judgment void, but merely left it open to reversal or modification in an appropriate and timely appellate

---

[6]Putting aside the district court's appellate jurisdiction over specified federal matters, including bankruptcy court decisions under 28 U.S.C §158.

proceeding." *Id.* at 415.   The *Rooker* Court recognized that this appellate proceeding could not be brought in U.S. district court, because the current tribunal lacked the requisite appellate authority to review the state decision.

Here, no one has suggested that the Mecklenburg Superior Court lacked jurisdiction to hear the dispute between the Purchasers and Walker. Therefore, if Walker believed the state court's decision to be erroneous, it was incumbent upon her to appeal it in the state system.   She cannot now mount a collateral attack on those rulings in bankruptcy court.

**III. Purchasers' Legal Theories of Nondischargeability were Not Preclusively Determined in the State Proceeding Under the Doctrines of Res Judicata or Collateral Estoppel. They May be Asserted by Purchasers in this Proceeding.**

Walker's second next defense to this dischargeability action is based upon estoppel arguments. Because the Purchasers' pled multiple causes of action (fraud, conversion, willful injury, etc.) in state court, but the resulting jury verdict and judgment only granted relief on the breach of contract claim, Walker contends these other legal theories are barred in this dischargeability case.   While a bit confused, her argument is that these legal theories are barred under the doctrines of (1) Res Judicata [they could have been asserted in state court but were not], or (2) Collateral Estoppel [these theories were actually litigated but rejected in the state action].   Either

way, Walker believes the State judgment bars Purchasers'
assertions that their debt is the product of anything but a
simple breach of contract.

Since the Purchasers have abandoned their §523(a)(2)
theory, we need only address the §523(a)(4) and (6) claims.
First, we will review the two estoppel doctrines under North
Carolina state law. Next, we will consider their applicability
to bankruptcy dischargeability actions generally. Then we will
review the elements of the two relevant dischargeabilty
exceptions. Finally, to the extent that these claims are not
precluded, we will apply the existent facts to the
dischargeability elements to determine whether there is a basis
to except the Purchasers' Judgment claim from Walker's
bankruptcy discharge.

A. *Res Judicata And Collateral Estoppel.*

Res judicata and collateral estoppel are related, but
legally distinct theories. Res judicata, or claim preclusion,
bars relitigation of claims that were or could have been raised
in a prior proceeding between the same parties. *Sartin v. Macik*,
535 F.3d 284, 287 (4th Cir. 2008) (citing *Thomas M. McInnis &
Assocs., Inc. v. Hall*, 349 S.E.2d 552, 556-57 (N.C. 1986)).
Collateral estoppel, or issue preclusion, bars the relitigation
of specific issues that were actually determined in a prior

21

action. *Id*. Both are estoppel doctrines, but they have differing preclusive effects in bankruptcy dischargeability litigation.

    B.   *Res judicata is Inapplicable to this Dischargeability Litigation Under the Supreme Court's Rulings in Brown v. Felsen and Archer v. Warner.*

In *Brown v. Felsen*, the U.S. Supreme Court held res judicata is inapplicable to a bankruptcy dischargeability proceeding. *Brown v. Felsen*, 442 U.S. 127, 138-39 (1979). Brown sued Felsen in state court for fraud. *Id.* at 128. The parties settled the case pursuant to a consent decree entered by the state court. *Id.* Under the consent decree, Felsen agreed to pay Brown a sum of money; however, neither the consent decree nor the parties' written stipulation indicated whether that liability was on account of fraud or something else. *Id.* Felsen later defaulted on the settlement payments and filed bankruptcy. *Id.*

Brown objected to the dischargeability of the debt, claiming it to be the product of fraud. *Id.* at 129. Effectively, Brown was asking the Bankruptcy Court to look behind the terms of the consent decree and stipulation to the circumstances giving rise to his original lawsuit. *Id.* at 128-29. The lower courts ruled against Brown. His claim was based upon a consent decree that did not mention fraud. *Id.* at 130. Since fraud was a part of Brown's original complaint, the lower courts believed res judicata would prevent the Bankruptcy Court

from looking behind the consent decree. *Id.* The claim was dischargeable. *Id.* at 130-31.

A unanimous Supreme Court thought otherwise. Admittedly, state law claim preclusion principles would bar Brown from reasserting a claim based on the same cause of action brought in state court. *Id.* at 131 (quoting *Montana v. United States*, 440 U.S. 147, 153 (1979)). However, res judicata did not prevent the bankruptcy court from looking beyond the record of the state-court proceeding and the documents that terminated the proceeding (the stipulation and consent judgment) to decide whether the debt embodied in the consent decree and stipulation was actually a debt for money obtained by fraud. *Id.* at 138-39.

*Brown*, a Bankruptcy Act case, was reaffirmed by the Supreme Court in the Bankruptcy Code case of *Archer v. Warner*, 538 U.S. 314, 328 (2003). The *Archer* situation was similar to that in *Brown*. The Archers sued the Warners in state court for fraud (and other claims) related to the Warners' sale of a company to the Archers. *Id.* at 317-18. The parties settled the action with the Warners agreeing to pay the Archers under a $100,000 promissory note. *Id.* at 317. The Archers specifically released the Warners from all other claims, and the state lawsuit was dismissed with prejudice. *Id.* Then the Warners failed to make the first payment on the note, and thereafter filed bankruptcy. *Id.* at 318. Notwithstanding the note, the

Archers sought a ruling from the bankruptcy court that their debt was a nondischargeable fraud debt under §523(a)(2). *Id.*

Again, the objecting creditors lost in the lower courts. *Id.* The settlement was viewed as working a "novation" that replaced the Archers' original fraud debt with a new debt for money promised under a contract. *Id.* The new debt was dischargeable. *Id.*

Once again, the Supreme Court reversed, holding that in spite of the settlement and the release, Archer's claim could be considered a debt for money obtained by fraud under §523(a)(2). *Id.* at 319, 322. *Archer* was based on *Brown v. Felsen*. *Id.* at 319. *Brown* dictated that res judicata did not prevent the bankruptcy court from looking beyond the state record and settlement documents to determine the true nature of the debt (i.e. fraud), *Brown*, 442 U.S. at 138-39. Consequently, the lower courts' novation theory could not be right. *Archer*, 538 U.S. at 320. If reducing a fraud claim to a settlement debt changed the nature of the debt for dischargeability purposes, then the nature of the debt in *Brown* would have changed making the obligation dischargeable. *Id.* Obviously, this was not the case. *Id.*

Further, such a theory would make *Brown's* instruction that the Bankruptcy Court "weigh all the evidence" pointless. *Id.* at 315 (citing *Brown*, 442 U.S. at 138. There would be nothing to

24

examine. *Id. Archer* repeated *Brown's* admonition that "the mere fact that a conscientious creditor has previously reduced his claim to judgment should not bar further inquiry into the true nature of the debt." *Id.*

Finally, the *Archer* Court reiterated the *Brown* Court's basic holding:

> 'Congress intended the fullest possible inquiry' to ensure that 'all debts arising out of' fraud are 'excepted from discharge,' no matter their form. Congress also intended to allow the determination whether a debt arises out of fraud to take place in bankruptcy court, not to force it to occur earlier in state court when nondischargeability concerns 'are not directly in issue and neither party has a full incentive to litigate them.' *Id.* (citing *Brown, 442 U.S. at 134.*

With little to factually distinguish *Archer* from *Brown*, the case was reversed and remanded. *Id.*

Our present case is controlled by these two Supreme Court decisions. Here, we also have a prior state court lawsuit that raised claims under a variety of legal theories, not only including breach of contract, but also fraud, misappropriation, and conversion. While the jury characterized the liability as one involving of breach of contract, we have no indication of what became of these other theories.

At this point, and as directed by *Brown* and *Archer*, our task is to determine the nature of the Purchasers' claims and whether they are of a sort that Congress intended should not be

discharged in bankruptcy. Purchasers view their claims as being nondischargeable under different subsections of §523(a), but the same rationale applies. Fiduciary fraud or defalcation, embezzlement, larceny, willful conversion and misappropriation are torts similar in nature to, and certainly no less heinous than, fraud. It follows that the fullest possible "inquiry" should also be undertaken in this dischargeability action to ensure that debts of such nature are not discharged, irrespective of form. As *Archer* notes, there is no reason to force the determination of a fraudulent debt to occur earlier in a state court rather than a bankruptcy court when nondischargeability is not at issue and the parties lack the incentives to litigate them.

> C. *Collateral Estoppel is Inapplicable to this Dischargeability Litigation.*

While res judicata does not bar our inquiry as to the nature of these debts, collateral estoppel might, if we only knew with certainty that these other legal theories had been "actually litigated" in state court. Unfortunately, this is far from clear.

The doctrine of collateral estoppel applies in bankruptcy dischargeability actions. *Macik*, 535 F.3d at 289. The "judicial proceedings of any ... state ... have the same full faith and credit in every court within the United States ... as they have

by law or usage in the courts of such State ... from which they are taken." 28 U.S.C. § 1738. Accordingly, whether a state court decision has a collateral estoppel effect in a dischargeability action is determined under that state's law. *Macik*, 535 F.3d at 287 (citing *Allen v. McCurry*, 449 U.S. 90, 96, (1980); *Pahlavi v. Ansari* (In re Ansari), 113 F.3d 17, 19 (4th Cir. 1997)). Since this case stems from a North Carolina verdict and judgment, we consider the collateral estoppel question under principles of North Carolina law.

North Carolina employs a traditional application of collateral estoppel. *Macik*, 535 F.3d at 288. That application of the doctrine can be summarized as follows: "[w]hen an issue of fact or law is actually litigated and determined by a valid and final judgment, and the determination is essential to the judgment, the determination is conclusive in a subsequent action between the parties, whether on the same or a different claim." Restatement (Second) of Judgments §27 (1982).

The requirements of collateral estoppel are: (1) the issues must be the same as those involved in the prior action, (2) the issues must have been raised and actually litigated in the prior action, (3) the issues must have been material and relevant to the disposition of the prior action, and (4) the determination of the issues in the prior action must have been necessary and

27

essential to the resulting judgment. *Macik*, 535 F.3d at 288 (citing *State v. Summers*, 351 N.C. 620 (N.C. 2000)).

Since we have the same parties, factual circumstances and underlying debt as in the state case, there is no question but that the elements of collateral estoppel exist as to liability and the amount of the Purchasers' claims against Walker. Clearly, and conclusively, we know that Walker breached her contract(s) with the Purchasers and owed them $60,000 as a result. Each of these matters was "actually litigated" in state court. What is in doubt is whether the Purchaser's alternative legal theories, fraud, misappropriation, conversion, etc. and their elements were also "actually litigated."

The "actually litigated" standard is defined by the Restatement: "[w]hen an issue is properly raised, by the pleadings or otherwise, and is submitted for determination, and is determined, the issue is actually litigated." Restatement (Second) of Judgments § 27 cmt. d (1982).

That standard is not met with any certainty in the present case. We know that these alternative legal theories were pled in the Purchasers state court complaint. We know they were not submitted to the jury and that they were not considered or made a part of its verdict.

What we do not know is "why?" The answer is not found in the state verdict or Judgment; nor is it found in a prior order

or those portions of the state court record submitted to this Court. In fact, none of the parties seems to know what happened to these alternative grounds for relief. Present counsel do not know, and the original attorneys in the state action are either dead or apparently unavailable.[7]

We can make conjecture about why these alternative theories were not submitted to the jury:

    (a)  Purchasers' abandoned these claims earlier in the state action;

    (b)  They were raised, considered by the presiding judge and rejected, but with no written ruling entered;

    (c)  The state court attorneys agreed between themselves that these theories were inapplicable;

    (d)  The Purchasers took the easiest route to judgment, the breach of contract theory; or

    (e)  These alternative theories were simply overlooked during the trial or charge conference.

However, because we do not know what happened, we cannot conclude that these alternative claims were actually litigated within the meaning of Restatement §27.[8]

Further, in the context of dischargeability litigation, any doubt as to whether an issue was previously litigated is resolved against finding issue preclusion. *See United States v. Ruhbayan,* 325 F.3d 197, 203 (4th Cir.2003)(quoting *Kauffman v. Moss,* 420 F.2d 1270, 1274 (3d Cir.1970)).

---

[7] They did not testify in any regard.

[8] *Macik* holds, under North Carolina law, that even a "death penalty" default entered upon motion and notice against a party who has engaged in dilatory conduct is not "actually litigated" if that party did not appear at the hearing. The current case offers no motion, hearing or ruling by the state court. As such, this is an even weaker case in which to apply the doctrine.

Consequently, whether the state judgment for breach of contract is occasioned by conduct constituting a §523(a)(4) violation [fiduciary fraud or defalcation, embezzlement and larceny] and/or a §523(a)(6) willful and malicious injury violation remains open for our consideration.

### IV. By applying the Deposit to Her Broker's Commissions Without Notice or Approval, Walker Committed Fiduciary Fraud or Defalcation, or Embezzlement or Larceny Within the Meaning of §523(a)(4).

Section 523(a)(4) excepts from discharge debts "for fraud or defalcation while acting in a fiduciary Capacity, as well as those debts occasioned by embezzlement or larceny. §523(a)(4).

Federal law determines whether a debtor is a "fiduciary." *KGB Int'l, Inc. v. Watford* (*In re* Watford), 374 B.R. 184, 189 (Bankr. M.D.N.C. 2007); *see also Consumer Produce Co., Inc. v. Masdea* (*In re* Masdea), 307 B.R. 466, 472 (Bankr. W.D. Pa. 2004)(citing *Blyler v. Hemmeter* (*In re* Hemmeter), 242 F.3d 1186, 1189 (9th Cir. 2001)). Such a fiduciary relationship exists for §523(a)(4) purposes only where there is either an express or statutory trust, as opposed to state law fiduciary obligations giving rise to constructive or resulting trusts. *Bradley v. Kelley* (*In re* Kelley), 1991 WL 249524, at *2 (4th Cir. 1991); *Continental Casualty Co. v. York* (*In re* York), 205 B.R. 759, 763 (Bankr. E.D.N.C. Nov. 27, 1997)

The contracts between the Purchasers, sellers and Walker created express trusts as to the Purchasers' Deposit and placed fiduciary responsibilities on Walker.

The elements of an express trust are all present: (1) an identifiable trust res, (2) specific fiduciary duties, and (3) its existence prior to and without reference to the act creating the debt. *Watford*, 374 B.R. at 190. The identifiable res is the earnest money deposit(s) to be held by Walker. The specific fiduciary duties are itemized in the purchase contracts, if not in state law (see below). Walker agreed to hold the Deposits in escrow, and should the sale close to apply the same to the purchase price. If not, she is required to release the monies to the Purchasers or the Seller, upon certain conditions. Finally, the contracts predate Walker's appropriation of the earnest monies, the act that created the debt in question.

Additionally, a real estate broker has statutorily imposed fiduciary responsibilities over monies, which she holds for the parties to a real estate transaction. A broker's relationship regarding a down payment which is entrusted to him or her is generally that of a trustee for the seller and purchaser. 12 CJS BROKERS § 162 (June 2009). Accordingly, a real estate broker who acts as seller's broker may become the trustee for an earnest money deposit, which he or she receives from the purchaser upon the failure of the seller to perform. *Id*. In

North Carolina, a broker who fails to account for and remit monies in his possession belonging to others, or one who engages in other improper, dishonest or fraudulent conduct, is subject to having his license suspended or forfeited. N.C. GEN. STAT. §93A-6, §93A-7, §93A-10.

Such statutory duties supply the required fiduciary relationship contemplated by §523(a)(4). *Watford*, 374 B.R. at 190 (citing Masdea, 307 B.R. at 472).

Defalcation under §523(a)(4) is the "misappropriation of trust funds or money held in any fiduciary capacity; [or the] failure to properly account for such funds." *Pahlavi v. Ansari* (*In re* Ansari), 113 F.3d 17, 20 (4th Cir. 1997). The act in question need not "rise to the level of ... 'embezzlement' or even 'misappropriation.'" *Id.* "[N]egligence or even an innocent mistake which results in ... [the] failure to account is sufficient." *Republic of Rwanda v. Uwimana* (*In re* Uwimana), 274 F.3d 806, 811 (4th Cir.2001).

With the bar set this low for defalcation, the higher standard of fiduciary "fraud" under §523(a)(4) is seldom considered. The term, however, has generally been interpreted as involving intentional deceit, associated with "actual fraud" as opposed to implied or constructive fraud. 4 COLLIER ON BANKRUPTCY, ¶523.10 (Alan N. Resnick & Henry J. Sommer eds, 15th ed. rev).

Embezzlement and larceny do not require a fiduciary relationship. Embezzlement is "the fraudulent appropriation of property by a person to whom such property has been entrusted, or into whose hands it has lawfully come." *OSB Mfg., Inc. v. Hathaway* (*In re* Hathaway), 364 B.R. 220, 239 (Bankr. E.D. Va. 2007). Larceny is the "fraudulent or wrongful taking and carrying away of the property to the taker's use without the consent of the owner." *Id*. The distinction between the two is that with embezzlement, the original acquisition of the property was lawful or with the owner's consent; while the felonious intent existed from the beginning with larceny. *Id*.

Against this backdrop, the nondischargeability of the State Judgment debt under §523(a)(4) could not be any clearer.

Walker held escrowed Deposits belonging to the Purchasers pursuant to two different contracts, the Bunker Hill and the Golden Leaf purchase agreements. These were standard form purchase contracts. Each clearly stipulated the limited purposes to which these monies could be applied, as well as the applicable terms and conditions. In short, these monies were either to be applied to a purchase or that failing, to be returned to the Purchasers or otherwise disbursed as the parties might agree.

Being aware of these provisions and further aware that the Golden Leaf sale was not going to close, Walker nevertheless

disbursed these monies to herself. This misappropriation was without any notice to, or approval by, the Purchasers or her clients, the sellers. Walker did this even while knowing that Purchasers had no obligation to pay her whatsoever. Then, having paid herself out of these monies, Walker concealed her misappropriation from the Purchasers for a period of months. When Purchasers demanded return of their Deposits, Walker further misled them about the status of these monies.

At a bare minimum, Walker is guilty of defalcation. However, on this record, the elements of these other torts, fraud and embezzlement are also clearly met.[9]

**V.    Under §523(A)(6), Walker Caused Willful And Malicious Injuries To Purchasers By Applying The Deposit To Her Broker's Commissions Without Notice Or Prior Authorization.**

The same operant facts also give rise to a §523(a)(6) "willful and malicious injury." A "willful" injury arises from an act of a debtor undertaken with the "intent to cause injury." *Kawwaauhau v. Geiger*, 523 U.S. 57, 61 (1998). A "malicious" injury does not require a showing of subjective ill will. *Kim v. Kim* (*In re Kim*), 2008 WL 2705082, at *3 (Bankr. E.D. Va. 2008). Rather, it is sufficient that the act was done intentionally and deliberately in knowing disregard of the rights of another. *Id.* Further, malice may be implied from the

---

[9] Larceny is not present, because there is no evidence to suggest Walker intended from the outset to misappropriate these monies.

debtor's conduct. *First National Bank v. Stanley* (*In re Stanley*), 66 F.3d 664, 667 (4th Cir. 1995). The "proper focus ... is not on [debtor's] good intentions, but simply on his exercise of dominion and control over funds that he knew belonged to another." *Id.* at 668.

A simple breach of contract by Walker, even if intentional, would not give rise to a §523(a)(6) violation. *Strum v. Exxon Co.*, 15 F.3d 327, 327 (4th Cir. 1994). For the debt to be nondischargeable under §523(a)(6), the breach must be accompanied by some conduct that is legally wrongful or tortuous within the meaning of §523(a)(6)). *Id.* One such independent, but intentional, act is willful conversion.

Conversion is defined as "an unauthorized assumption and exercise of the right of ownership over goods or personal chattels belonging to another, to the alteration of their condition or the exclusion of an owner's rights." *Myers v. Catoe Constr. Co.*, 343 S.E.2d 281, 283 (N.C. Ct. App. 1986). "The essence of conversion is not the acquisition of property by the wrongdoer, but a wrongful deprivation of it to the owner ... and in consequence it is of no importance what subsequent application was made of the converted property, or that defendant derived no benefit from the act." *Lake Mary Ltd. P'ship. v. Johnston*, 551 S.E.2d 546, 552 (N.C. Ct. App. 2001)(citing 89 C.J.S. Trover and Conversion § 3, pp. 533-34). A

wrongful conversion of another's property is a "willful" and "malicious" injury within the meaning of § 523(a)(6). *Stanley*, 66 F.3d at 668; 3 COLLIER ON BANKRUPTCY, ¶523.12[4] (Alan N. Resnick & Henry J. Sommer eds, 15th ed. rev).

The Deposits were the property of the Purchasers, and Walker knew it. She was aware that the sales had not closed, meaning these monies were not available for application to the sales price. She knew under these contracts that the escrowed monies were not intended for her benefit.  She knew the Purchasers did not owe her any money. Even so, she knowingly and wrongfully disbursed these funds from the escrow account to herself as a "commission" (or more appropriately, as a theft). This was a "wrongful conversion" giving rise to a nondischargeable debt.

In sum, while the State jury's verdict is denominated as a breach of contract, upon a closer examination of the attendant facts, the nature of the obligation is in addition one of  a fiduciary defalcation or fraud, or embezzlement within the meaning of §523(a)(4); and a wrongful conversion under §523(a)(6).  Consequently, the State Judgment debt of $60,000.00, plus Plaintiffs' costs is non-dischargeable pursuant to §523(a)(4) and (6).

Purchasers have requested recovery of their attorneys' fees in prosecuting this action, but have not argued or

identified any authority for such an award. Since §523(a) is

silent on these matters, that request is **DENIED.**

A judgment of nondischargeability shall issue accordingly.

**SO ORDERED.**

**This Order has been signed electronically.    United States Bankruptcy Court
The judge's signature and court's seal
appear at the top of the Order.**